FILED BY_____ *SM* _____D.C.

**Feb 9, 2026**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTL

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FLSD Case Number: 26-mj-6064-PAB

|  |  |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 26-cr-10030 |
| v. | Violation: |
| (1) SNIDERS JEAN JACQUES, | Count One: Wire and Bank Fraud Conspiracy (18 U.S.C. § 1349) |
| (2) GERMAN OLIVO, (3) JIM KELLY MICHEL, (4) TANYA PIERRE, and (5) ROSALIE CLEMENT-JACKSON, | Forfeiture Allegation: (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461) |
| Defendants |  |

## INDICTMENT

At all times relevant to this Indictment:

### General Allegations

1.     Defendant SNIDERS JEAN-JACQUES lived in Florida.

2.     JEAN-JACQUES operated three businesses: (1) On the Go ("OTG"), a tax preparation and credit repair business with offices in Boston, Massachusetts and North Miami, Florida; (2) Black Market Luxury ("BML"), a luxury car and yacht rental business in Miami; and (3) Nursing Loving Care ("NLC"), an unregistered nursing home in Miami.

3.     Defendant GERMAN OLIVO lived in Florida.

4.     Defendant JIM KELLY MICHEL lived in Florida.

5.     Defendant TANYA PIERRE lived in Florida and worked as JEAN-JACQUES's assistant.

6.     Defendant ROSALIE CLEMENT-JACKSON lived in Florida and worked as a

1

mortgage loan officer.

7.      Co-conspirator 1 ("CC-1") lived in Florida and worked as a real estate agent.

8.      Borrowers 1 and 2 lived in Florida.

9.      Employee 1 lived in Florida and worked for OTG.

10.     Employee 2 lived in Florida and worked for BML.

11.     Rocket Mortgage ("RM"), United Wholesale Mortgage ("UWM"), Cross Country Mortgage, Caliber Home Loans, Gold Star Mortgage Financial Group, Plaza Home Mortgage, Paramount Residential Mortgage Group, and Quontic Bank (collectively, "the Mortgage Lenders") were financial institutions as defined in Title 18, United States Code, Section 20.

12.     Strata Wynwood and Midtown Five were high-rise apartment complexes in Miami.

13.     Victim 1 had a Social Security number that originally issued in Virginia.

14.     Victim 2 had a Social Security number that originally issued in Delaware.

### Overview of the Conspiracy and the Scheme to Defraud

15.     Between at least in or about May 2018 and continuing through at least in or about June 2025, in the District of Massachusetts, the Southern District of Florida, and elsewhere, JEAN-JACQUES, OLIVO, KELLY MICHEL, PIERRE, CLEMENT-JACKSON, and CC-1 conspired with each other and others known and unknown to the Grand Jury to obtain money and property, including mortgage loans and apartment leases, through fraudulent misrepresentations, including fake paystubs, altered bank statements, fraudulent credit histories, and the unauthorized use of Social Security numbers belonging to others.

### Objects and Purpose of the Conspiracy

16.     The objects of the conspiracy were to commit wire and bank fraud by submitting false and fraudulent financial information to lenders and property owners to obtain mortgage loans and leases.   The purpose of the conspiracy and the scheme to defraud was to profit and to conceal the submission of the false and fraudulent information from lenders, property owners, and law enforcement authorities.

### Manner and Means of the Conspiracy and Scheme to Defraud

17.     Among the manner and means by which JEAN-JACQUES, OLIVO, KELLY MICHEL, PIERRE, CLEMENT-JACKSON, CC-1, and co-conspirators known and unknown to the Grand Jury carried out the conspiracy and the scheme to defraud were the following:

    a.     Recruiting individuals with poor credit histories who needed mortgage loans and apartment rentals ("Fraudulent Applicants");

    b.     Obtaining and providing victims' Social Security numbers to Fraudulent Applicants for use in mortgage loan and rental applications;

    c.     Paying for so-called "tradelines" in which co-conspirators temporarily added Fraudulent Applicants' names to the credit accounts of individuals with strong credit histories, in order to improve Fraudulent Applicants' credit scores;

    d.     Creating fake paystubs for Fraudulent Applicants;

    e.     Forging bank statements to show purported savings and income for Fraudulent Applicants;

    f.     Submitting the fake paystubs and forged bank statements on behalf of

3

Fraudulent Applicants for mortgage loans and apartment leases;

g.     Applying for apartment rentals for the use of Fraudulent Applicants but using identities of other individuals in the applications;

h.     Charging Fraudulent Applicants a percentage of loan proceeds as a fee; and

i.     Communicating with each other about Fraudulent Applicants, false and stolen Social Security numbers, tradelines, fake paystubs, forged bank statements, loan and apartment rental applications, and payments.

18.     In this fashion, JEAN-JACQUES, OLIVO, KELLY MICHEL, PIERRE, CLEMENT-JACKSON, CC-1 and others applied for more than $6.7 million, and obtained more than $3.7 million, in loans from lenders, and applied for and obtained dozens of apartment rentals from property owners.

Acts in Furtherance of the Conspiracy and the Scheme to Defraud

19.     On various dates between at least May 2018 and in or about June 2025, in the District of Massachusetts, the Southern District of Florida, and elsewhere, JEAN-JACQUES, OLIVO, KELLY MICHEL, PIERRE, CLEMENT-JACKSON, CC-1 and others known and unknown to the Grand Jury committed and caused to be committed the following acts, among others, in furtherance of the conspiracy and scheme to defraud:

a.     On or about May 15, 2018, KELLY MICHEL messaged JEAN-JACQUES a listing of available tradelines and the cost of each.

b.     On or about December 5, 2020, JEAN-JACQUES instructed PIERRE, in substance, to provide an apartment complex with the phone number for a Fraudulent Applicant,

4

but to pretend the number was PIERRE's, because the apartment had been rented in PIERRE's name.

        c.      On or about January 7, 2021, JEAN-JACQUES instructed PIERRE, in substance, to add a tradeline to a Fraudulent Applicant's credit so the Fraudulent Applicant could qualify for a mortgage loan.

        d.      On or about February 24, 2021, JEAN-JACQUES and CLEMENT-JACKSON arranged for JEAN-JACQUES to pay $10,000 cash to CLEMENT-JACKSON in exchange for CLEMENT-JACKSON securing mortgage loan financing for one of JEAN-JACQUES's Fraudulent Applicants.

        e.      On or about March 23, 2021, PIERRE forwarded JEAN-JACQUES a message from a property manager about how to make rental payments for a unit rented in PIERRE's name on behalf of a Fraudulent Applicant. In response, JEAN-JACQUES instructed PIERRE to forward the message to CC-1.

        f.      On or about September 27, 2021, PIERRE notified JEAN-JACQUES that she was going to be late to work because CC-1 "has me going to art plaza to renew some lease" in PIERRE's name.

        g.      On or about August 9, 2022, JEAN-JACQUES messaged PIERRE from Massachusetts asking her, in substance, to gather personally identifiable information for Employee 1, Employee 2, and others so that JEAN-JACQUES could provide it to KELLY MICHEL to procure tradelines and fake or stolen Social Security numbers.

h.      On or about September 28, 2023, PIERRE messaged JEAN-JACQUES to ask which of their Fraudulent Applicant clients were supposed to have tradelines.

i.      On or about October 24, 2023, JEAN-JACQUES messaged PIERRE with KELLY MICHEL's WhatsApp contact information and asked PIERRE, in substance, to make sure tradelines appeared on a Fraudulent Applicant's credit report.

*Borrower 1*

j.      On or about June 13, 2018, JEAN-JACQUES sent Borrower 1's email address to KELLY MICHEL for the purpose of securing a tradeline for Borrower 1.

k.      On or about June 13, 2018, KELLY MICHEL messaged JEAN-JACQUES that "[a]ll tradelines have posted boss."

l.      On or about June 1, 2020, Borrower 1 messaged JEAN-JACQUES asking whether, in substance, the tradeline JEAN-JACQUES had offered her would boost her credit enough to purchase a home.

m.      On or about January 8, 2021, JEAN-JAQUES messaged CLEMENT-JACKSON asking, in substance, how the mortgage application for Borrower 1 was progressing.

n.      On or about March 23, 2021, Borrower 1 sent JEAN-JACQUES copies of her true bank statements for January and February 2021.  The January 2021 statement showed a starting balance of $527.18.

o.      On or about March 23, 2021, JEAN-JACQUES sent OLIVO Borrower 1's true January and February 2021 bank statements and fake NLC paystubs that JEAN-JACQUES had created for Borrower 1, despite that Borrower 1 had never worked for NLC.   JEAN-

JACQUES instructed OLIVO, in substance, to alter the bank statements to show a starting balance of at least $65,000 and deposits corresponding to the fake NLC paystubs.

        p.      On or about March 24, 2021, OLIVO messaged JEAN-JACQUES altered versions of Borrower 1's January and February 2021 bank statements. The altered January 2021 statement had a starting balance of $69,643.28, and both statements reflected deposits corresponding to the fake NLC paystubs.

        q.      On or about March 25, 2021, JEAN-JACQUES, from Massachusetts, paid OLIVO $200 via CashApp for altering Borrower 1's bank statements and messaged OLIVO a screenshot showing he had sent the payment.

        r.      On or about May 26, 2021, JEAN-JACQUES messaged OLIVO asking him, in substance, to create two more months of altered bank statements for Borrower 1.

        s.      On or about May 28, 2021, OLIVO messaged JEAN-JACQUES altered versions of Borrower 1's April and May 2021 bank statements.

        t.      On or about June 24, 2021, KELLY MICHEL added another tradeline to Borrower 1's credit report.

        u.      On or about July 26, 2021, CC-1 messaged JEAN-JACQUES reminding him, in substance, to prepare fake paystubs and fraudulent June and July bank statements for Borrower 1.

        v.      On or about July 26, 2021, JEAN-JACQUES messaged CC-1 a copy of Borrower 1's altered June 2021 bank statement.

7

w.      On or about July 26, 2021, Borrower 1 emailed JEAN-JACQUES a copy of her true bank statement for July 2021, which showed a beginning balance of $3,050.41.

x.      On or about July 26, 2021, JEAN-JACQUES messaged OLIVO asking him, in substance, to alter Borrower 1's July 2021 bank statement.

y.      On or about July 27, 2021, OLIVO messaged JEAN-JACQUES a version of Borrower 1's July 2021 bank statement that OLIVO had altered to show a beginning balance of $95,995.43.

z.      On or about July 27, 2021, JEAN-JACQUES messaged CC-1 the altered July 2021 bank statement for Borrower 1, but a few seconds later instructed CC-1, in substance, not to use the statement because it was "no good."

aa.     On or about July 27, 2021, JEAN-JACQUES messaged OLIVO to complain, in substance, that the deposit dates on the altered July 2021 bank statement for Borrower 1 did not match the dates on the fake NLC paystubs.

bb.     On or about July 27, 2021, OLIVO messaged JEAN-JACQUES revised versions of Borrower 1's altered June and July 2021 bank statements.

cc.     On or about July 28, 2021, JEAN-JACQUES messaged CC-1 the revised altered versions of Borrower 1's June and July 2021 bank statements and confirmed they were "good to go."

dd.     On or about August 27, 2021, JEAN-JACQUES sent Borrower 1's August 2021 bank statement and additional fake NLC paystubs to OLIVO and instructed OLIVO, in substance, to alter the statement as he had done in the past.

8

ee.　　On or about August 28, 2021, OLIVO sent JEAN-JACQUES an altered August 2021 bank statement for Borrower 1 showing deposits corresponding to the fake NLC paystubs.

ff.　　On or before September 13, 2021, JEAN-JACQUES and CC-1 caused Borrower 1's altered bank statements and fake NLC paystubs to be submitted to RM with Borrower 1's mortgage application.

gg.　　On or about September 13, 2021, Borrower 1 sent JEAN-JACQUES a screenshot of an email from an RM representative regarding verification of Borrower 1's employment.

hh.　　On or about September 27, 2021, Borrower 1 sent JEAN-JACQUES an iMessage in which she reminded him, in substance, that the lender would call JEAN-JACQUES to verify her employment.

*Borrower 2*

ii.　　On or before October 8, 2021, CLEMENT-JACKSON notified Borrower 2 that, based on CLEMENT-JACKSON's review of his financial information and bank statements, Borrower 2 would not qualify for a mortgage loan, and referred Borrower 2 to JEAN-JACQUES to obtain altered bank statements.

jj.　　On or about October 8, 2021, Borrower 2 sent JEAN-JACQUES copies of his true bank statements for August and September 2021.  The August 2021 statement showed a starting balance of $15,103.98.

9

kk.     On or about October 8, 2021, JEAN-JACQUES sent Borrower 2 images of fake paystubs JEAN-JACQUES had created for Borrower 2 showing payroll from BML, despite that Borrower 2 had never worked for BML.

ll.     On or about October 8, 2021, JEAN-JACQUES sent Borrower 2 contact information for BML and Borrower 2's purported title and start date at the company.

mm.     On or about October 8, 2021, JEAN-JACQUES sent Borrower 2's true August and September 2021 bank statements and the fake BML paystubs to OLIVO and instructed OLIVO, in substance, to alter the bank statements to show a starting balance of at least $84,000 and deposits corresponding to the fake BML paystubs.

nn.     On or about October 12, 2021, OLIVO sent JEAN-JACQUES altered versions of Borrower 2's August and September 2021 bank statements.  OLIVO had altered the August 2021 statement to have a starting balance of $84,103.98, and both statements reflected deposits corresponding to the fake BML paystubs.

oo.     On or about October 13, 2021, JEAN-JACQUES messaged Borrower 2 an updated start date for Borrower 2's purported job at BML and the name of Borrower 2's purported manager at the company.

pp.     On or about October 14, 2021, JEAN-JACQUES sent Borrower 2 an additional purported paystub from BML.

qq.     On or about October 14, 2021, Borrower 2 emailed the purported BML paystubs and his altered bank statements for August and September 2021 to CLEMENT-JACKSON, who in turn caused them to be sent to UWM in connection with Borrower 2's

10

mortgage loan application.

      rr.      On or about October 26, 2021, JEAN-JACQUES messaged OLIVO a screenshot of Borrower 2's October 2021 transactions from his bank that Borrower 2 had previously sent to JEAN-JACQUES.

      ss.      On or about October 27, 2021, OLIVO messaged JEAN-JACQUES an altered version of the screenshot showing Borrower 2's October 2021 transactions, which OLIVO had altered to include a purported payroll deposit from BML.

      tt.      On or about November 2, 2021, JEAN-JACQUES notified OLIVO, in substance, that Borrower 2 needed the altered bank statements as soon as possible because Borrower 2's lender would not accept the screenshot of his October 2021 transactions.

      uu.      On or about November 2, 2021, OLIVO asked JEAN-JACQUES, in substance, if the mortgage lender had received the screenshot and whether the lender would compare the screenshot to the altered statement OLIVO was preparing such that they had to match.

      vv.      On or about November 18, 2021, JEAN-JACQUES caused Borrower 2's purported employment with BML to be verified with Borrower 2's mortgage lender.

      ww.      On or about November 19, 2021, UWM funded a mortgage loan of $407,483 for Borrower 2.

*Employee 1*

      xx.      On or about August 12, 2022, PIERRE messaged JEAN-JACQUES Employee 1's true date of birth and Social Security number.

11

yy.     On or about August 13, 2022, JEAN-JACQUES messaged KELLY MICHEL Employee 1's true date of birth and Social Security number.

zz.     On or about August 14, 2022, KELLY MICHEL messaged JEAN-JACQUES, in substance, that a fake Social Security number and tradeline for Employee 1 would cost $650.

aaa.     On or about September 4, 2022, KELLY MICHEL sent JEAN-JACQUES a photo that listed Victim 1's Social Security number for Employee 1 and indicated that Victim 1's Social Security number had issued in Delaware.

bbb.     On or about September 4, 2022, KELLY MICHEL sent JEAN-JACQUES a photo indicating that Employee 1 had a credit score of 734.

ccc.     On or about September 4, 2022, JEAN-JACQUES messaged CC-1 Employee 1's name, true date of birth, and both her true Social Security number and Victim 1's Social Security number. The message also stated, in substance, that Employee 1 had worked for NLC since February 19, 2019, and provided the name and contact information for Employee 1's purported supervisor, despite that Employee 1 never worked for NLC. The message also listed Employee 1's true residential address and provided, in substance, the date Employee 1 purportedly began living at the address and the name of Employee 1's purported landlord ("the September 4, 2022 Message").

ddd.     On or about September 9, 2022, CC-1 ran a credit report for Employee 1 in connection with an application lease a 5,000 square-foot residence in Florida.

12

eee.    On or about September 10, 2022, JEAN-JACQUES sent CC-1 a copy of the September 4, 2022 Message, but with Employee 1's true Social Security number removed and a fabricated address in place of Employee 1's true residential address ("the September 10, 2022 Message").

fff.    On or about October 1, 2022, JEAN-JACQUES sent PIERRE a copy of the September 10, 2022 Message.

ggg.    On or before October 10, 2022, JEAN-JACQUES created fake paystubs for Employee 1 from BML, despite that Employee 1 never worked there.

hhh.    On or before October 10, 2022, OLIVO altered June, July, and August 2022 bank statements for an account in Employee 1's name, to make it appear Employee 1 was receiving payroll from BML, despite that Employee 1 never worked there.

iii.    On or about October 10, 2022, JEAN-JACQUES and CC-1 caused a rental application in Employee 1's name to be electronically submitted to Strata Wynwood.

*Employee 2*

jjj.    On or about August 12, 2022, PIERRE messaged JEAN-JACQUES Employee 2's true date of birth and Social Security number.

kkk.    On or about August 13, 2022, JEAN-JACQUES messaged KELLY MICHEL Employee 2's true date of birth and Social Security number.

lll.    On or about August 14, 2022, KELLY MICHEL messaged JEAN-JACQUES, in substance, that a fake Social Security number and tradeline for Employee 2 would cost $650.

13

mmm. On or about August 23, 2022, KELLY MICHEL sent JEAN-JACQUES a photo that listed Victim 2's Social Security number for Employee 2 and indicated that Victim 2's Social Security number had issued in Virginia.

nnn. On or about September 15, 2022, JEAN-JACQUES sent PIERRE a WhatsApp message listing Employee 2's name, true date of birth and email address, but Victim 2's Social Security number and a fabricated residential address for Employee 2.

ooo. On or about September 15, 2022, JEAN-JACQUES sent CC-1 a WhatsApp message listing Employee 2's name and true date of birth, but Victim 2's Social Security number. CC-1 used this information to run a credit score for Employee 2.

ppp. On or about September 15, 2022, CC-1 messaged JEAN-JACQUES that Employee 2's credit score was 696.

qqq. On or about September 16, 2022, JEAN-JACQUES sent CC-1 images of fake paystubs JEAN-JACQUES had created for Employee 2 showing payroll from NLC, despite that Employee 2 had never worked for there.

rrr. On or about September 17, 2022, JEAN-JACQUES sent OLIVO a WhatsApp voice message in which he requested, in substance, that OLIVO create bank statements for Employee 2 for June, July, and August 2022.

sss. On or about September 17, 2022, in a series of WhatsApp messages, JEAN-JACQUES and OLIVO discussed, in substance, that the requested monthly bank statements for Employee 2 could be from any bank and the beginning balance should be at least $110,000.

14

ttt.     On or about September 17, 2022, OLIVO sent JEAN-JACQUES forged bank statements for Employee 2 for June, July, and August 2022. The beginning balance in the June 2022 statement was $110,632.14.

uuu.     On or about September 17, 2022, JEAN-JACQUES sent CC-1 a WhatsApp message with Employee 2's name and date of birth, but Victim 2's Social Security number. The message also stated, in substance, that Employee 2 had worked for NLC since April 15, 2019, and provided the name and contact information for Employee 2's purported supervisor. The message further listed a fabricated residential address for Employee 2 and provided, in substance, the date Employee 2 purportedly began living at the address and the name of Employee 2's purported landlord ("the September 17, 2022 Message").

vvv.     On or about September 17, 2022, JEAN-JACQUES sent CC-1 copies of the fabricated bank statements for June through August 2022 for Employee 2 and fabricated IRS Forms W-2 for Employee 2 from NLC for 2020 and 2021.

www.    On or about September 20, 2022, JEAN-JACQUES caused a $2,512 per month, year-long lease for a single-family home in Georgia to be electronically signed in Employee 2's name.

xxx.     On or about September 21, 2022, JEAN-JACQUES sent PIERRE a copy of the September 17, 2022 Message.

yyy.     On or about September 22, 2022, JEAN-JACQUES caused a rental application in Employee 2's name to be electronically submitted to Midtown Five.

zzz.    On or about October 27, 2022, JEAN-JACQUES forwarded PIERRE a screenshot of an email from a representative of Midtown Five indicating, in substance, that Employee 2's rental application had been denied because the documents supporting her application had been edited and could not be authenticated.

COUNT ONE
Wire and Bank Fraud Conspiracy
(18 U.S.C. § 1349)

The Grand Jury charges:

20.    The Grand Jury re-alleges and incorporates by reference Paragraphs 1 through 19(zzz) of this Indictment.

21.    From at least in or about May 2018 through at least in or about June 2025, in the District of Massachusetts, the Southern District of Florida, and elsewhere, the defendants,

(1)    SNIDERS JEAN JACQUES,
(2)    GERMAN OLIVO,
(3)    JIM KELLY MICHEL,
(4)    TANYA PIERRE, and
(5)    ROSALIE CLEMENT-JACKSON,

conspired with each other and with others known and unknown to the Grand Jury to commit the following offenses:

a.   bank fraud, that is, to knowingly execute, and attempt to execute, a scheme and artifice to defraud financial institutions, that is, the Mortgage Lenders, and to obtain moneys, funds, credits, assets, securities and other property owned by and under the custody and control of the Mortgage Lenders, by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344; and

b.   wire fraud, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, to transmit and cause to be transmitted, by

17

means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds, for the purpose of executing the scheme to defraud, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1349.

FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

22.     Upon conviction of the offense in violation of Title 18, United States Code, Section

1349, set forth in Count One, the defendants,

       (1)     SNIDERS JEAN JACQUES,
       (2)     GERMAN OLIVO,
       (3)     JIM KELLY MICHEL,
       (4)     TANYA PIERRE, and
       (5)     ROSALIE CLEMENT-JACKSON,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C),

and Title 28, United States Code, Section 2461(c), any property, real or personal, which

constitutes or is derived from proceeds traceable to the offense.

23.     If any of the property described in Paragraph 22, above, as being forfeitable

pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code,

Section 2461(c), as a result of any act or omission of the defendants–

       a.   cannot be located upon the exercise of due diligence;

       b.   has been transferred or sold to, or deposited with, a third party;

       c.   has been placed beyond the jurisdiction of the Court;

       d.   has been substantially diminished in value; or

       e.   has been commingled with other property which cannot be divided without
           difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property

of the defendants up to the value of the property described in Paragraph 22 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

A TRUE BILL

FOREPERSON

KRISTEN A. KEARNEY
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS

District of Massachusetts: February 5, 2026
Returned into the District Court by the Grand Jurors and filed.

/s/ Leonardo T. Vieira, 2:15pm
DEPUTY CLERK

20